IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| GREGORY HUBBARD, et al., | ) |
| Plaintiffs, | ) |
| v. | ) Civ. No. 00-531-SLR |
| STANLEY TAYLOR, et al., | ) |
| Defendants. | ) |

---

Paul E. Crawford, Esquire of Connolly, Bove, Lodge & Hutz, Wilmington, Delaware.  Counsel for Plaintiffs.

Richard W. Hubbard, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware.  Counsel for Defendants.

---

**MEMORANDUM OPINION**

Dated:  September 20 , 2006
Wilmington, Delaware

**ROBINSON, Chief Judge**

## I. INTRODUCTION

On May 30, 2000, plaintiffs, who were housed at the Multi-Purpose Criminal Justice Facility "(Gander Hill"), filed this action pursuant to 42 U.S.C. § 1983. (D.I. 38) Plaintiffs, proceeding pro se, were appointed counsel and an amended complaint was filed on November 23, 2002, on behalf of all pretrial detainees. (D.I. 115) The amended complaint contains two counts alleging constitutional violations for conditions of confinement and failure to protect. A third count alleges a violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.

On March 11, 2003, oral argument was held on dispositive motions filed by the parties. The parties agreed that the motion and cross-motion for summary judgment stood or failed on the issue of whether sleeping on a mattress on the floor was a per se violation of plaintiffs' constitutional rights. (D.I. 188 at 39-41) On March 20, 2003, the court granted defendants' motion to dismiss defendant Delaware Department of Correction ("DOC") and defendants' motion for summary judgment. (D.I. 166) At the same time, the court denied as moot plaintiffs' motion for class certification and denied their motion for summary judgment. Id. The U.S. Court of Appeals for the Third Circuit vacated the grant of summary judgment and remanded the conditions of confinement claim, the ADA claim, and the denial of the class certification

motion.  Hubbard v. Taylor, 399 F.3d 150, 168 (3d Cir. 2005).

Now before the court are defendants' renewed motion for summary judgment on the issue of qualified immunity and defendants' renewed motion for summary judgment against plaintiff Kevin Ketchum.  (D.I. 189, 190)  For the reasons set forth below, the court will grant both motions for summary judgment.

## II.  BACKGROUND

### A.  Facts Related to Pretrial Detainees

Defendants rely upon their statement of facts as set forth in their original motion for summary judgment filed on August 30, 2002.  (D.I. 150)  Similarly, plaintiffs adopt and incorporate by reference their counterstatement of facts as set forth in their reply in opposition to defendants' motion for summary judgment filed September 17, 2002.  (D.I. 157)  Plaintiffs also provide additional facts.  (D.I. 194)

Plaintiffs, pretrial detainees during the relevant time period, allege a conditions of confinement claim in violation of the Fourteenth Amendment.  More particularly, they challenge the practice at Gander Hill of triple-celling pretrial detainees. This practice requires that one pretrial detainee sleep on the floor on a mattress in close proximity to the toilet, while the remaining two cellmates sleep on bunk beds.

Defendant Stanley Taylor ("Taylor) has been the Commissioner of the DOC since the fall of 1995, Raphael Williams ("Williams")

-2-

is the warden at Gander Hill, and M. Jane Brady is the former Attorney General of Delaware. Hubbard, 339 F.3d at 153. Gander Hill was constructed in 1982 and enlarged when a new wing was added in 1992. Id. In 1995, a prison master plan was developed in response to ongoing prison condition litigation. Id. at 155. A prison construction project was undertaken, pursuant to the plan, to eliminate overcrowding at Gander Hill. (D.I. 151 at A68, A69) The actual population, however, was higher than the projected population. (D.I. 151 at A69)

Gander Hill receives approximately 18,000 admissions per year. (D.I. 151 at A60) Commissioner Taylor keeps the Delaware Legislature informed during the annual budget hearing of the actual prison population, the capacity, and the net growth at Gander Hill. (D.I. 151 at A56) He also has advised the Legislature of the risk of overcrowding. (D.I. 151 at 56)

Pretrial detainees are housed in the west wing of Gander Hill, and sentenced inmates are housed in the east wing. Hubbard, 399 F.3d at 153-54. Some sentenced inmates are also housed in the west wing. (D.I. 190 at B28, B42) According to Commissioner Taylor, the division between the pretrial detainees and the sentenced inmates is a function of security and convenience. (D.I. 151 at A51) Specifically, the west wing is closer to the Justice of the Peace court located at Gander Hill. (D.I. 151 at A51)

-3-

The typical west wing modular unit or "pod" contains two
housing units connected by a control room from which correctional
officers can observe the two units.  Hubbard, 399 F.3d at 154.
Each unit contains a large dayroom of approximately 3,900 square
feet, containing a sink, tables, chairs and a television.  Id.
Twenty cells surround the dayroom.  Id.  With some minor
variation, they are all approximately the same size.  Id.  The
cells on the west wing were originally designed to hold one
prisoner.  (D.I. 151 at A51)  The west wing cells were converted
from single to double occupancy and then, in approximately 1998
or 1999, the cells were converted to triple occupancy.  (D.I. 151
at A52)  Triple occupancy was implemented because the institution
was "simply out of bed space".  (D.I. 151 at A52)  The cells in
the east wing, where the sentenced inmates are housed, were
originally designed for double occupancy.  (D.I. 151 at A51-52)

In the west wing, an inmate must sleep on a floor mattress
when three are housed in a given cell.  Hubbard, 399 F.3d at 154.
The newest arrival is required to sleep on a mattress on the
floor until one of his cellmates is released or moved.  Id.  This
frees a bunk for the inmate who had been on the floor mattress,
and any new arrival in that cell would then take his place on the
floor mattress.  Id.  The west wing cells range in size from 69
to 76 square feet, and the net unencumbered space in the cell
(gross footage of 69-76 square feet less space required for a

-4-

bed, mattress, desk and toilet) is less than 50 square feet or 16 square feet per occupant of each tripled cell.  Id.

Inmates are continually transferred out of Gander Hill at the rate of 180 per month.  (D.I. 151 at A58)  As a result of the prison expansion and the recent opening of a housing unit at the Delaware Correctional Center ("DCC"), enough inmates were transferred from Gander Hill to DCC to empty the gym that had been used for housing.  (D.I. 151 at A58)

Over $2.8 million dollars has been spent on capital improvements at Gander Hill during the past five years to maintain or elevate the living conditions for prisoners.  (D.I. 151 at 168)  Improvements were made to the air conditioning system, fire alarm system, roofing and roof replacement, shower, hot water system, water filtration system, kitchen floor, and duct work.  (D.I. 151 at 168)

According to plaintiffs, they were forced to sleep on the cell floor for a minimum of two months at a time, and most spent three to seven months sleeping on a floor mattress before a cellmate left and a bunk became available.  Hubbard, 399 F.3d at 154.  They also assert that they have to deal with the extreme discomfort and disease associated with sleeping on a concrete floor, and that a Prison Facilities Audit supports their claim that the foam mattresses provided by the prison officials are thin, worn-out and filthy.  Id.  The mattresses have since been

-5-

replaced. (D.I. 190 at B43)

Plaintiffs assert that "triple bunking" and its associated problems could have been avoided had Commissioner Taylor added an additional 2500 beds that had been envisioned as part of the master plan devised in response to litigation that has been ongoing for twenty years. Hubbard, 399 F.3d at 155 (citing Dickerson v. Castle, C.A. No. 10256, Delaware Court of Chancery) (prison officials agreed to stop "double bunking" and return to placing a single inmate in cells at state prisons). Finally, it is plaintiffs' position that triple-celling continued even after newly constructed cells at DCC could have alleviated housing three to a cell in the west wing, but the additional beds were never occupied because prison officials failed to train enough correctional officers to properly respond to an increase in the prison population. Hubbard, 399 F.3d at 155. Commissioner Taylor testified that he discusses the turnover rate for officers during his joint finance committee presentation when the DOC makes it budget request. (D.I. 151 at A55)

Plaintiff Kevin Ketchum ("Ketchum") testified that he was convicted in 1988. (D.I. 195 at B13) He has not been a pretrial detainee at any time subsequent to 1988. (D.I. 189, ex. C at 17). In 2000, for approximately five months, he was housed at Gander Hill in the west wing of the facility. (D.I. 195 at B14) During that time, he was housed in a cell containing three

-6-

inmates, but he did not sleep on a mattress on the floor.  Id.
He slept in the bottom bunk.  (D.I. 195 at B19)

## B.  Facts Related to the ADA Claim

Ketchum adopts and incorporates by reference his
counterstatement of facts as set forth in his reply in opposition
to defendants' motion for summary judgment filed September 17,
2002.  (D.I. 157)  Ketchum was diagnosed in 1994 with kidney
disease; as of 1998, he was suffering from end stage renal
disease and was diagnosed with hepatitis C in approximately 2000.
(D.I. 189, ex. C at 12; D.I. 195 at B13, B141)  Since 1994, he
has been on dialysis and, at the time of his deposition, received
renal dialysis three times a week.  (D.I. 189, ex. C at 11-12,
45, 46)

Ketchum has been treated by nephrologists as well as other
physicians.  Id. at 33-35.  Dr. Scott Bralow ("Dr. Bralow")
authored a letter dated August 10, 1998, stating he saw no
contraindication for an evaluation for renal transplant, but that
Ketchum's limitation was the availability of transplants in the
State of Delaware.  (D.I. 195 at B141)  A letter from Prison
Health Services ("PHS") stated that, as an inmate, Ketchum was
not eligible for the National Transplant List, but that should he
be paroled he would be a prime candidate for transplant
evaluation.  Id. at B142.

Ketchum has been trying to get evaluated for listing or for

-7-

placement on the transplant list since 1997. (D.I. 189, ex. C at 45) Dr. Ivens, a physician with Gander Hill's medical contractors Correctional Medical Services ("CMS") and PHS, denied Ketchum's request for a kidney transplant in approximately 1997. Id. at 37, 40. Ketchum testified that when he grieved the disapproval and appeared before the bureau chief, he was told that if the doctor said he needed a kidney transplant, then he would receive it. (D.I. 189, ex. C at 41) Ketchum also testified that he spoke to his nephrologist, Dr. Bralow, and was told that a dialysis patient should be able to receive a transplant. Id. at 41. Ketchum was later told by Dr. Bralow that it was a security risk for him to leave the state to undergo a "markup" at a Philadelphia hospital. Id.

Ketchum's other efforts include writing to former Warden Carr and former Attorney General Brady requesting release of medical records which contained, according to Ketchum, a letter recommending Ketchum for a kidney transplant. (D.I. 197 at B130-34) Ketchum also provided an authorization for release of the records. Id. at 133-34. Ketchum sought the records to initiate placement on a transplant list. Id. at B131. Ketchum was advised that his medical records were the property of the contractor providing health services to the DOC (i.e., PHS) and that it was not controlled or represented by the DOC. Id. at B135. Ketchum was later advised that DOC policy did not allow it

-8-

to release to him any information from his medical records. Id. at B137. Ketchum also sought to subpoena his medical records, albeit unsuccessfully. Id. at B138.

Ketchum filed a medical grievance with the contract medical services provider to obtain his medical records and complained that he was not receiving appropriate medical treatment. Id. at B139. The grievance was denied by Dr. Ostrum of PHS, who stated that Ketchum must "follow the chain of command and await the decision of the powers that be". Id. at P140. On June 10, 1999, the grievance seeking a kidney transplant was denied on the basis that Ketchum failed to attach letters from the physicians who recommend the transplant. Id. at B143. The denial referred to Dr. Bralow's letter pointing out that the letter indicated that Ketchum was "stable on dialysis" and that Ketchum could medically undergo a transplant evaluation, not that Ketchum needed a transplant. Id. The grievance was also denied on the basis that Ketchum was not clinically eligible because he tolerated hemodialysis. Id.

In August 2000, Ketchum filed a second medical grievance complaining that Dr. Ivens "delayed [his] request for a kidney transplant for over a year". Id. at B145. He asked to be sent to an outside hospital for markup for transplantation and to be placed on the medicare transplant listing for a donor kidney. Id. He also wrote a letter to Commissioner Taylor requesting he

-9-

be given an evaluation for a kidney transplant. Id. at B146.

Warden Taylor testified during his deposition that the policy with respect to organ transplants for prisoners at Gander Hill is a medical decision that the doctor recommends. (D.I. 151 at A85) He was aware of Ketchum's request for a kidney transplant and indicated that the request had been made to the medical providers. Id. at A86. Warden Taylor testified that he believed that the medical providers denied the request on the grounds that it was not medically necessary; that is was not life or death. Id.

At the time of the filing of the complaint, Ketchum was a prisoner housed in a DOC institution. It is undisputed that a few years ago, Ketchum was released from prison.

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n. 10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person

-10-

could conclude that the position of the person with the burden of proof on the disputed issue is correct." <u>Horowitz v. Federal Kemper Life Assurance Co.</u>, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted).  If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial."'  <u>Matsushita</u>, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)).  The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion."  <u>Pennsylvania Coal Ass'n v. Babbitt</u>, 63 F.3d 231, 236 (3d Cir. 1995).

The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).  If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

### A. Qualified Immunity

Plaintiffs, as pretrial detainees, raise their conditions of confinement claim under § 1983 which provides a cause of action against any person who, acting under color of state law, deprives another of his or her federal rights. Defendants assert that they are entitled to qualified immunity. (D.I. 190)

Under certain circumstances, qualified immunity can shield a public official from civil suit. Williams v. Bitner, 455 F.3d 186, 190 (3d Cir. 2006)(citing Hunter v. Bryant, 502 U.S. 224, 227 (1991)). "Qualified immunity shields state officials from suit where their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Id. (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Qualified immunity analysis requires a two-step inquiry. First to be determined is whether the facts alleged show that the defendant's conduct violated a constitutional or statutory right. Id. If there is no constitutional violation, then the inquiry ends. If answered affirmatively, the court must then determine whether the constitutional or statutory right allegedly violated by the defendant was "clearly established." Id. If the court concludes that the defendant's conduct violated a clearly established constitutional or statutory right, then it must deny the

-12-

defendant the protection afforded by qualified immunity. Id.

Generally, "a right is clearly established for purposes of qualified immunity when its contours are 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Id. at 191 (citations omitted). "To find that a right is clearly established, 'the right allegedly violated must be defined at the appropriate level of specificity.'" Id. (citing Wilson v. Layne, 526 U.S. 603, 615 (1999)). "[I]n some cases a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." Id. (citations omitted). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." Id. Under certain circumstances, budgetary constraints could cloak an individual with good-faith immunity. Youngberg v. Romeo, 457 U.S. 307, 323 (1982); see Birrell v. Brown, 867 F.2d 956 (6th Cir. 1989).

Plaintiffs' conditions of confinement claim rests upon their challenge to the practice of housing three detainees in cells intended and designed for one person ("triple-celling"). Plaintiffs claim that triple-celling requires someone to sleep on a mattress that must be placed on the cell floor adjacent to a toilet, and that this violates the Fourteenth Amendment by

-13-

depriving them of their liberty without due process of law.

Defendants assert that they are entitled to qualified immunity. More particularly, they argue that even if the court should determine that the conditions that existed at Gander Hill during the relevant time period violated the Fourteenth Amendment, they cannot be held personally liable because they had not been put on notice that such conditions of confinement violated the U.S. Constitution.

Plaintiffs respond that pretrial detainees were subjected to conditions of confinement much worse than sentenced prisoners and that defendants knew, or should have known, that this harsher treatment was contrary to established Supreme Court precedent in Bell v. Wolfish, 441 U.S. 520 (1979). Plaintiffs argue that the cases relied upon by defendants are inapposite inasmuch as they are based upon an Eighth Amendment analysis and case law should have placed defendants on notice that the conditions imposed upon the pretrial detainees violated their constitutional rights.

### 1. Conduct of a Constitutional Nature

"[P]retrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that. . . are enjoyed by convicted prisoners." Bell v. Wolfish, 441 U.S. 520, 545 (1979). To assess whether the constitutional rights of a pretrial detainee have been violated, it must be determined whether the "disability is imposed for the purpose of punishment

-14-

or whether it is but an incident of some other legitimate governmental purpose." Bell v. Wolfish, 441 U.S. 520, 539 (1979); see also Hubbard, 399 F.3d at 165. "Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" Bell, 441 U.S. at 538. "In assessing whether the conditions are reasonably related to the assigned purposes, [the court] must further inquire as to whether these conditions cause [inmates] to endure [such] genuine privations and hardship over an extended period of time, that the adverse conditions become excessive in relation to the purposes assigned to them." Hubbard, 399 F.3d at 159-160 (citing Bell, 441 U.S. at 542) (internal quotation marks omitted).

Plaintiffs' position that placement of pretrial detainees in the west wing is not related to a legitimate penal goal, but was intended to punish pretrial detainees to encourage plea bargains, is not well-taken. Plaintiffs provide no facts to support this statement, but instead rely upon a decision from the U.S. Court of Appeals for the Second Circuit. (D.I. 194, ex. C) The facts before the court indicate that plaintiffs were not being punished by being forced to sleep on the floor of their cells. Rather, triple-celling occurred in the west wing because the institution

-15-

ran out of bed space.[1]  Overcrowding has become a fact of life in prisons and the need for inmates who cannot make bail to be housed somewhere underlies this legitimate governmental purpose. See Bell v. Wolfish, 441 U.S. at 539-540.

As is well established, it is peculiarly within the province of correctional officials, based on their expertise, to determine whether conditions are related to a legitimate government interest, and the court should give deference to the correctional officials' opinions unless it is shown that they have blatantly exaggerated.  Bell v. Wolfish, 441 U.S. at 547-548; Hubbard, 399 F.3d at 159.  The facts before the court are that the actual number of inmates is greater than projected and that, even with prison expansions, overcrowding has occurred.  Prison officials have determined that triple-celling pretrial detainees is a method to deal with their overcrowded facilities.

The court must next ask if the conditions imposed on plaintiffs amounted to punishment.  Hubbard, 399 F.3d at 155. In conducting the Fourteenth Amendment analysis to evaluate punishment of pretrial detainees, the Supreme Court has not "elaborate[d] upon the duration of confinement that could

---

[1]Plaintiffs argue that, as pretrial detainees, they were subjected to conditions of confinement worse than sentenced prisoners when comparing the west wing to the east wing.  The facts indicate that, in addition to pretrial detainees, some sentenced inmates were also housed in the west wing of Gander Hill and it appears they were treated similarly.  For example, even after pretrial detainees were sentenced they might remain in the west wing for several weeks, continuing to sleep on mattresses on the floor until space became available in the east wing.  (D.I. 190, at B28)

constitute an extended period of time, nor [has] it elaborate[d] upon the kind of privations and hardship that could constitute punishment in violation of the Due Process Clause." Hubbard, 399 F.3d at 159 (citing Bell, 441 U.S. at 542). However, the Court has cautioned that "confining a given number of people in a given amount of space in such a manner as to cause them to endure genuine privations and hardship over an extended period of time might raise serious questions under the Due Process Clause as to whether those conditions amounted to punishment." Bell, 441 U.S. at 542. The Court has further held, in the pretrial detainee context, that punishment violating the due process rights of a pretrial detainee is that which is arbitrary and purposeless. Id. at 539.

As noted above, pretrial detainees at Gander Hill are sometimes required to sleep on a mattress on the floor because of lack of space, with the newest resident sleeping on the floor. As soon as a bed becomes available elsewhere, a detainee is moved. Here, the sleeping conditions lasted for a period from three to seven months. This district has held that a pretrial detainee plaintiff was not punished by being forced to sleep on the floor of his cell for a period of five days, Brookins v. Williams, 402 F. Supp. 2d 508, 512-13 (D. Del. 2005), but being forced to sleep on a mattress on the floor of a cell for over 22 months stated a claim that the pretrial detainee's due process

-17-

rights may have been violated, Yelardy v. Taylor, Civ. No. 03-1032-GMS, 2006 WL 680660 at *8 (D. Del. March 14, 2006). It has been determined that a pretrial detainee forced to sleep on the floor on many occasions over a two-year period was not punishment. Askew v. Fairman, 880 F. Supp. 557 (N.D. Ill. 1995) (analyzed under the Eighth Amendment). There was no Fourteenth Amendment violation when a pretrial detainee was forced to sleep on the floor for an extended time during a four-month period. Jones v. Sheehan, No. 91 C 8146, 1993 WL 153829 (N.D. Ill 1993). Other courts have found that requiring a pretrial detainee to sleep on a mattress on the floor violates the Fourteenth Amendment "without regard to the number of days for which a prisoner is so confined." See Lyons v. Powell, 838 F.2d 28 (1st Cir. 1988); Vazquez v. Gray, 523 F. Supp. 1359 (S.D.N.Y. 1981).

In the case at bar, providing sleeping accommodations on the floor was in response to overcrowding at Gander Hill. Nothing in the record supports a finding that the action was arbitrary or purposeless so as to appear on its face to be punishment. Moreover, plaintiffs failed to identify any intention on the part of the defendants to punish. Plaintiffs argue, but provide no facts to support their position, that the triple-celling was intended to induce detainees to enter guilty pleas. Based on the record before the court, the pretrial detainees' period of

-18-

triple-celling cannot be considered punishment and, therefore, is not a constitutional violation.

## 2. Clearly Established Law

Even were the court to find that plaintiffs' constitutional rights were violated, the law was not sufficiently clear so that a reasonable official would understand that what he was doing violated a constitutional right. Admittedly, Bell v. Wolfish, 441. U.S. 520 (1979), established the general constitutional standard that the conditions of confinement for pretrial detainees must not amount to punishment.

Nonetheless, time after time, this district has ruled that requiring prisoners to sleep on mattresses on the floor does not violate the constitution. Renn v. Taylor, 2001 WL 657591 (D. Del. Mar. 2, 2001) (Robinson, J.); Brandon v. Taylor, Civ. No. 97-205-SLR (D. Del. Mar. 27, 2000) (Robinson, J.); Bagwell v. Brewington-Carr, 2000 WL 1728148 (D. Del. Apr. 27, 2000) (Sleet, J.); Jackson v. Brewington-Carr, 1999 WL 27124 (D. Del. Jan. 15, 1999) (Farnan, J.); Bartley v. Taylor, Civ. No. 98-503 (D. Del. Sept. 10, 1999) (McKelvie, J.); Torres v. Brewington-Carr, Civ. No. 98-159 (D. Del. Nov. 29, 1999) (Longobardi, J.); Harris v. Brewington-Carr, 49 F. Supp. 2d 378 (D. Del. 1999) (Farnan, J.); Martin v. Brewington-Carr, Civ. No. 98-04 (D. Del. Dec. 31, 1997) (Farnan, J.); McKenna v. Brewington-Carr, Civ. No. 98-368 (D. Del. Apr. 5, 1997) (Farnan, J.). Although most of these cases

-19-

were analyzed in an Eighth Amendment context, some were brought
by pretrial detainees.  Additionally, as discussed in <u>Hubbard</u>,
Third Circuit caselaw was somewhat confusing when determining the
correct analysis for pretrial detainees in conditions of
confinement claims.  <u>See</u> <u>Hubbard</u>, 399 F.3d at 166 (in reference
to a nonmedical conditions of confinement claim, "[o]ur analysis
became somewhat misleading as we proceeded to adopt a 'deliberate
indifference' inquiry'").  Given the confusion,[2] it was more than
reasonable for prison officials to rely upon these cases in
continuing to triple-cell pretrial detainees.

Moreover, as the Third Circuit clearly elucidated in
<u>Hubbard</u>, "the issue of the constitutionality of placing floor
mattresses adjacent to a toilet was simply not before [it] and
[it] did not decide [the issue]."  399 F.3d at 163.  It is
apparent that the issue has not yet been decided in this Circuit.

---

[2]The level of constitutional protection afforded to pretrial detainees
continues to be unclear.  <u>Bell v. Wolfish</u> provides that, under the Due Process
Clause, a pretrial detainee may not be punished and "a court must decide
whether the disability is imposed for the purpose of punishment or whether it
is but an incident of some other legitimate governmental purpose."  441 U.S.
520, 536 n.16, 539 (1979).  <u>Bell</u> holds that pretrial detainees retain **at least**
those constitutional rights as those enjoyed by a convicted prisoner.  441
U.S. at 545. (court's emphasis).  In <u>Hubbard</u>, the court stated that it
"recognized that pretrial detainees are entitled to **greater** constitutional
protection than that provided by the Eighth Amendment."  <u>Hubbard</u>, 399 F.3d at
167 n.23 (citing <u>Kost v. Kozakiewicz</u>, 1 F.3d 176, 188 n.10 (3d Cir. 1993)
(court's emphasis).  Yet the referenced footnote states, "[pretrial detainees
. . .are entitled to **at least** as much protection as convicted prisoners, so
the protections of the Eighth Amendment would seem to establish a floor of
sorts."  <u>Kost</u>, 1 F.3d at 188 n.10 (court's emphasis); <u>see</u> <u>also</u> <u>Sylvester v.</u>
<u>Newark</u>, No. 03-4872, 120 Fed.Appx. 419, 423 (3d Cir. 2005)(stating in a
pretrial detainee inadequate medical care claim, "the Supreme Court has
concluded that the Fourteenth Amendment affords pretrial detainees protections
'at least as great as the Eighth Amendment protection available to a convicted
prisoner,' **without deciding** whether the Fourteenth Amendment provides greater
protections") (court's emphasis).

Based upon the foregoing, the court finds that the defendants are entitled to qualified immunity. Accordingly, their renewed motion for summary judgment will be granted in this regard.

## B. Ketchum's Due Process Claim

This case was filed on behalf of pretrial detainees and the conditions of their confinement at Gander Hill. Defendants move for summary judgment against Ketchum on this claim. (D.I. 189) Plaintiffs concede they never claimed Ketchum was a pretrial detainee, but argue that fact should not preclude him from having his claims adjudicated. For the first time in this litigation, however, they posit that Ketchum's due process rights under either the Eighth or Fourteenth Amendment were violated when medical records were withheld.

With regard to the conditions of confinement claim, the undisputed facts are that during the relevant time period, Ketchum was not a pretrial detainee but a sentenced prisoner. During a five-month period when he was housed in the west wing of Gander Hill, he never slept on a mattress on the floor. Moreover, there are no allegations in the amended complaint that Ketchum was a pretrial detainee, only that he is a disabled person within the meaning of the ADA. (D.I. 115 at ¶ 10)

Ketchum now asserts a due process right to his medical records. When bringing a § 1983 claim, a plaintiff must allege that some person has deprived him of a federal right, and that

-21-

the person who caused the deprivation acted under color of state
law.  West v. Atkins, 487 U.S. 42, 48 (1988).  The only named
defendant who had any dealings with Ketchum's medical records is
former Attorney General Brady, but the facts do not support a
finding that she deprived Ketchum of any constitutional right.

Personal involvement can be shown through allegations that a
defendant directed, had actual knowledge of, or acquiesced in,
the deprivation of a plaintiff's constitutional rights."  Evancho
v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005) (quoting Rode v.
Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988)); see Monell v.
Department of Social Services, 436 U.S. 658, 694-95 (1978).
Supervisory liability may attach if the supervisor implemented
deficient policies and was deliberately indifferent to the
resulting risk or the supervisor's actions and inactions were
"the moving force" behind the harm suffered by the plaintiff.
Sample v. Diecks, 885 F.2d 1099, 1117-118 (3d Cir. 1989); see
also City of Canton v. Harris, 489 U.S. 378 (1989); Heggenmiller
v. Edna Mahan Corr. Inst. for Women, No. 04-1786, 128 Fed.Appx.
240 (3d. Cir. 2005).

As discussed, there are no allegations in the amended
complaint that Ketchum's rights under either the Eighth or
Fourteenth Amendment were violated in not providing him medical
records.  Nonetheless, the court will address the issue raised at
this late date.

-22-

The facts before the court are that Ketchum wrote to former Warden Carr and former Attorney General Brady seeking assistance in obtaining his medical records from PHS. (D.I. 195 at B130-131)  Former Attorney General Brady assigned the matter to a deputy attorney general who took action and advised Ketchum that the Attorney General's office did not instruct the DOC on how to run its institution.  Id. at B135.  Nor could the Attorney General's office order the warden at Gander Hill to turn over medical records.  Id.  Ketchum was advised that the Attorney General's office had no control over PHS.  Id.  Ketchum was advised to direct his requests directly to PHS.  The deputy attorney general attempted to assist Ketchum by forwarding his medical authorization to the health care unit at Gander Hill.

Rather than show deliberate indifference to Ketchum's concerns or acquiescing in any deprivation, former Attorney General Brady took steps to assist Ketchum in obtaining his medical records, to the extent of forwarding his medical authorization to the health care unit at Gander Hill.  Even had the amended complaint contained a due process claim for denial of medical records, the facts do not support a finding that any of the remaining named defendants violated Ketchum's right to due process.  Accordingly, the court will grant summary judgment in favor of defendants and against Ketchum on this issue.

-23-

## C. Americans with Disabilities Act

Defendants move for summary judgment on several bases: (1) the ADA provides no basis for individual personal liability;[3] (2) the defendants in their official capacities have Eleventh Amendment immunity from suit; (3) Ketchum has been released from prison and, therefore, no longer has a viable claim for prospective relief; (4) allegations of medical inadequacy or medical malpractice are insufficient to allege a Title II ADA violation; and (5) there are no facts to support Ketchum's claim that he was discriminated against on the basis of his disability. (D.I. 189)

Ketchum brings this claim pursuant to Title II of the ADA, 42 U.S.C. § 12132, which pertains to public services and states: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." A "public entity" includes state prisons and "Title II authorizes suits by private citizens for money damages against public entities that violate § 12132." United States v. Georgia,

---

[3]Title II of the ADA does not authorize suits against individuals. Jordan v. Delaware, 433 F. Supp. 433, 442-43 (D. Del. 2006) (citations omitted). Ketchum asserts that defendants are liable only in their official capacities. (D.I. 195 at 5 n.2)

-U.S.-, 126 S.Ct. 877, 879 (2006);[4] <u>Pennsylvania Dep't of Corr.</u>
<u>v. Yeskey</u>, 524 U.S. 206, 210 (1998).  To establish a prima facie
case under Title II of the ADA, Ketchum must show that: "(1) he
is a 'qualified person with a disability'; (2) he was either
excluded from participation in or denied the benefits of a public
entity's services, programs or activities, or was otherwise
discriminated against by the public entity; and (3) such
exclusion, denial of benefits, or discrimination was by reason of
his disability."  <u>Id.</u> at 443 (citation omitted).

The court is mindful that the ADA does not create a federal
cause of action for prisoners challenging the medical treatment
provided for their underlying disabilities.  <u>Grzan v. Charter</u>
<u>Hosp. of Northwest Indiana</u>, 104 F.3d 116, 121-22 (7th Cir. 1997).
Also, the ADA is not a means to bring a claim of medical
negligence, nor is it "violated by a prison's simply failing to
attend to the medical needs of its disabled prisoners."  <u>Bryant</u>
<u>v. Madigan</u>, 84 F.3d 246, 249 (7th Cir. 1996).  This district has
found that the failure to treat an inmate's hepatitis C or to

---

[4]In January of this year, the Supreme Court held that, "insofar as Title
II creates a private cause of action for damages against the States for
conduct that actually violates the Fourteenth Amendment, Title II validly
abrogates state sovereign immunity."  <u>United States v. Georgia</u>, -U.S.-, 126 S.
Ct. 877, 882 (2006).  The Court reasoned that, to the extent the plaintiff's
Title II claims were based on conduct that constituted a constitutional
violation, the state's immunity could be abrogated, but it declined to issue
judgment on whether the state's immunity could be validly abrogated when the
state's conduct violated Title II, but not the Fourteenth Amendment.  <u>Id.</u> at
880-882.  In the present case, the State of Delaware was dismissed by the
court and plaintiffs did not appeal the dismissal.  As will be discussed, even
if the State of Delaware were reinstated as a defendant for the purposes of
the ADA, summary judgment would be granted in its favor.

perform a liver biopsy did not violate Title II of the ADA.
Jordan v. Delaware, 433 F. Supp. 2d 433 (D. Del. 2006).
Allegations that a prison failed to provide medications that were
prescribed to an inmate were found not actionable under Title II
of the ADA. See Galvin v. Cook, No. CV 00-29-ST, 2000 WL
1520231, at *6-7 (D. Or. Oct. 3, 2000). Similarly, allegations
that the department of correction failed to arrange for and
facilitate the inmate's placement on a liver transplant list
failed to state a viable Title II claim. Rosado v. Alameida, No.
Civ. 03CV1110J (LSP), 2005 WL 892120 (S.D. Cal. Feb. 8, 2005).

Ketchum appears to argue that he was released due to his end
stage renal disease, rather than be provided medical care. In a
conclusory fashion he states this resulted in his exclusion from
participation in or denial of the benefits of the services,
programs or activities of a public entity and he was subjected to
discrimination. The record indicates otherwise.

While incarcerated, Ketchum was not denied adequate medical
services because of his end stage renal disease. Indeed, it is
undisputed that he received regular dialysis treatment. Rather,
Ketchum's claim is that he did not receive the medical service he
desired, that is, to receive a kidney transplant. Moreover, the
record does not reflect discrimination in denying the request.
Ketchum was told by a prison official that if a physician
indicated he needed a kidney transplant, then he would receive

one.   The record reflects that prison officials relied upon their medical providers in making the decision to deny Ketchum's request for a transplant.   The final denial specifically relied upon a letter from Ketchum's nephrologist that Ketchum was stable on dialysis and that, medically, he could undergo a transplant evaluation.   The nephrologist further opined, however, that Ketchum was **not** clinically eligible for a transplant because he tolerated hemodialysis.

Ketchum has failed to establish a prima facie case under the ADA.   Therefore, defendants' motion for summary judgment will be granted.

## V.   CONCLUSION

For the reasons discussed above, plaintiff's motion for leave to file a surreply in opposition to defendants' renewed motion for summary judgment is granted and defendants' motions for summary judgment are granted.   An order shall issue.